UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                    :
EDWARD ROHE and GEORGETTE ROHE,     :
                                                    :
                         Plaintiffs,                :
                                                    :
            -v-                                     :
                                                    :
BERTINE, HUFNAGEL, HEADLEY, ZELTNER, :
DRUMMON & DOHN, LLP and PETER P.      :
ZELTNER, ESQ.,                                 :
                                                    :
                         Defendants.                :
                                                    :
------------------------------------------------------------ X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 1, 2016
```

14-cv-9641 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

In this case, plaintiffs Edward and Georgette Rohe seek damages against an attorney, Peter Zeltner, and his law firm, Bertine, Hufnagel, Headley, Zeltner, Drummond & Dohn, LLP.  (ECF No. 6.)  Plaintiffs allege that defendants committed professional malpractice and breached a fiduciary duty they owed plaintiffs in connection with a number of trusts of which plaintiffs were the beneficiaries and separate entities affiliated with those trusts.

Now before the Court are defendants' motion for summary judgment, either in part or in full, and plaintiffs' motion to amend the complaint to add certain additional plaintiffs.  (ECF Nos. 71 & 80.)  Defendants raise a number of arguments in support of their motion for summary judgment, the broadest of which is that all of plaintiffs' claims are time-barred by the statute of limitations.  (See ECF No. 76, at 18-25.)

The undisputed facts adduced in this matter demonstrate that there is no genuine question of material fact as to whether plaintiffs' claims are barred; they

are, and the doctrinal and equitable exceptions to the operation of New York's

statute of limitation are not available.  For that reason, and for the reasons further

established below, the Court GRANTS defendants' motion for summary judgment in

its entirety and DENIES plaintiffs' motion to amend.

I.   FACTUAL BACKGROUND

    A.   <u>The Losses</u>

Edward Rohe's father died in 2004, and as a result two trusts were created,

the August E. Rohe Generation Skipping Trust ("GS Trust"), and the August Rohe

Family Trust ("Family Trust").  (Pl.'s 56.1[1] ¶ 4.)  Edward Rohe was the sole

beneficiary of both Trusts.  (<u>Id.</u>)  Also in 2004, a man named Michael Formanek,

employed by Uihlein Financial, began to serve as trustee and investment manager

of these Trusts.  (<u>Id.</u> ¶ 5.)

Formanek's investments, and defendants' involvement with them, is the

basis for plaintiffs' claim to damages in this case.  Many of the details of the

investments are contested but, as discussed below, the facts of these investments

are not material to the resolution of the instant motions because the statute of

limitations bars plaintiffs' malpractice and breach of fiduciary duty claims.  The

Court therefore recounts only a summary of the allegations, as presented by

plaintiffs.

Plaintiffs allege that in 2008 and 2009, Formanek invested funds from the

GS and Family Trusts in CTG Athletics, a startup.  (<u>Id.</u> ¶ 6.)  One of the ways he

---

[1] The notation "Pl.'s 56.1" refers to the "Additional Facts Which Preclude Summary Judgment" section of plaintiffs' Rule 56.1(b) Statement of Disputed Facts, available as ECF No. 83.

did so was through an entity organized under the New York limited liability law called Milwaukee Famous Ventures LLC ("MFV").  (Id. ¶ 7.)  The sole stated purpose of MFV was to invest in CTG Athletics.  (Id.)  The GS and Family Trusts were members of MFV, as was an entity called Caught Looking Partners, in which Zeltner and other members of Bertine Hufnagel were members.  (Id. ¶ 8.)  The MFV operating agreement contained a conflict waiver which acknowledged that Bertine Hufnagel both represented Formanek in connection with the formation of MFV and also represented CTG Athletics, the underlying investment.  (Id. ¶ 7.)

Plaintiffs further allege that in addition to his interest in Caught Looking Partners, Zeltner also created another company, named 463 DP, LLC, which had a direct ownership interest in CTG Athletics.  (Id. ¶ 10.)  The partners of Bertine Hufnagel owned 463 DP, LLC.  (Id. ¶ 11.)

Plaintiffs allege that between December 2008 and June 2009 Formanek caused $440,000 in funds from the GS and Family Trusts to be transferred to CTG Athletics.  (Id. ¶ 8.)  CTG Athletics is now defunct and all investments by the Trusts are total losses.  (Id. ¶ 9.)

In addition, plaintiffs allege that Formanek caused Rohe Ventures LLC, an entity solely owned by the Family Trust, to transfer more than $335,000 directly to Bertine Hufnagel between April 2005 and June 2010.  (Id. ¶ 15.)  The annual account statements for the Rohe Ventures investment account were sent to Zeltner at the Bertine Hufnagel office every year from 2004 through 2014.  (Id. ¶ 16.)

The losses associated with CTG Athletics and direct transfers to Bertine Hufnagel are not the full extent of plaintiffs' claimed damages.  Plaintiffs further

3

allege that defendants' malpractice and breach of fiduciary duty allowed Formanek to engage in "persistent gouging of the price assets," (ECF No. 80, at 13) resulting in a multitude of losses from a number of different investments.  According to plaintiffs, this continued until Formanek's death in April 2013, the first time plaintiffs learned of the diminution of the Trusts' funds.  (ECF No. 6 ¶ 25.)  In total, plaintiffs' amended complaint seeks $3,699,143.47 in damages.  (Id. ¶¶ 44 & 50.)

> B.    Zeltner's Representation of Edward Rohe

As discussed both above and below, the facts that are material to resolution of the instant motion are those related to Zeltner's representation of Edward Rohe.

Defendant Peter Zeltner first represented plaintiff Edward Rohe in the early 1970s in connection with a traffic violation.  (Pl.'s 56.1 ¶ 1; Rohe Dep.[2] 44:13-20.) Bertine Hufnagel, Zeltner's employer, had previously represented other members of the Rohe family.  (Rohe Dep. 44:21-45:3.)  In the decades that followed, Zeltner represented Edward Rohe in a number of matters.  (Id. 45:19-49:21; Pl.'s 56.1 ¶ 2.) For example, Edward Rohe testified that Zeltner assisted him in connection with structuring loans for real estate purchases.  (Rohe Dep. 64:6-8.)

Many, but not all, of the instances in which Zeltner represented Rohe related to trusts and estates legal work.  (Pl.'s 56.1 ¶ 2; Zeltner Aff.[3] ¶ 4.)  This work began in association with wills Zeltner prepared for both plaintiffs in 1983.  (Rohe Dep. 52:19- 53:23.)  Zeltner represented the plaintiffs during the 2004 preparation of the Trust agreements.  (Id. 66:7-11.)  He also assisted in both drafting Edward Rohe's

---

[2] The notation "Rohe Dep." refers to the transcript of the August 18, 2015 deposition of Edward A. Rohe, available as ECF No. 81, Exh. E.

[3] The notation "Zeltner Aff." refers to the Affidavit of Peter Zeltner, available as ECF No. 78.

revocable trust (which was separate from the GS and Family Trusts) in 2004 and revising it in July 2006 and September 2008.  (Id. 61:17-21; 67:12-21; 76:13-77:8.) In 2008 Zeltner worked to revise plaintiffs' wills, and at some point after 2008 he drafted a trust agreement for a trust that benefited plaintiffs' daughter.  (Id. 80:11-81:25; 86:11-24.)

Plaintiffs have produced a number of documents relevant to the existence and scope, if any, of the professional legal relationship between plaintiffs and defendants after 2008.  On August 5, 2008 and March 5, 2009, Formanek sent Edward Rohe letters regarding Trust assets and distributions that were copied to Zeltner.  (Pl.'s 56.1 ¶ 14.)  On February 20, 2009, Formanek faxed Zeltner twice, both times enclosing copies of email discussions between Formanek and Edward Rohe regarding the Trusts.  (Id.)  On July 20, 2009, Formanek copied Zeltner into an email discussion between Formanek and Edward Rohe regarding the trust for plaintiffs' daughter, and on July 28, 2009, Formanek and Zeltner exchanged emails about whether the trustees of that trust could delegate management of its assets to third parties.  (Id.)  On August 24, 2009, Formanek faxed Zeltner a document entitled "Third Party Authorization and Indemnity" for plaintiffs' daughters' trust, and Zeltner wrote a letter to a non-party stating that he "represents the [plaintiffs' daughter's] Trust" and that the trust agreement authorized delegation of management to third parties.  (Id.)  Finally, on March 9, 2010, July 29, 2010, and March 1, 2011, Formanek sent Edward Rohe letters regarding Trust assets and distributions that were copied to Zeltner.  (Id.)

5

As discussed above, annual account statements for the Rohe Ventures investment account were sent to Zeltner at the Bertine Hufnagel office every year from 2004 through 2014.  (Id. ¶ 16.)  Additionally, Edward Rohe testified during his deposition that he occasionally called Zeltner when he encountered problems communicating with Formanek.  (Rohe Dep. 117:11-21.)  Edward Rohe testified that these calls occurred between 2007 and 2013, including "a few" between 2009 and 2013. (Id. 118:8-13; 121:9-12.)

According to Edward Rohe's deposition testimony, plaintiffs never entered into a retainer agreement with Zeltner or Bertine Hufnagel.  (Rohe Dep. 158:14-19.)  During the many years between the early 1970s and 2013, defendants invoiced plaintiffs for discrete legal tasks.  (See id. 51:3-9 (bridge loan for purchasing real estate); 56:7-12 (1983 wills); 63:4-15 (2004 trust agreements); 70:16-22 (2006 revision to revocable trust agreements).)  Nonetheless, plaintiffs allege that "Zeltner and Plaintiffs maintained a professional attorney client relationship by various means of communication until August 28, 2013."  (Pl.'s 56.1 ¶ 13.)

As discussed above, Formanek died in April 2013.  According to Edward Rohe's deposition testimony, he received a call from Uihlein Financial in July 2013 that disclosed the current assets of the GS and Family Trusts as well as Zeltner's involvement in some of the companies in which Formanek had invested.  (Rohe Dep. 226:25-227:5.)  After learning that information, Rohe called Zeltner as his office and home and left a message.  (Id. 227:6-16.)  Zeltner returned Rohe's call the next day and, according to Rohe, told him that he had represented Formanek, that he had known funds were coming out of the Trusts, and that Rohe was "going to have to get

6

[himself] another attorney." (<u>Id.</u> 228:4-229:6.)  This was apparently the last conversation between Zeltner and Edward Rohe.  Plaintiffs requested that defendants send their files to another attorney, which Zeltner did by a letter of August 28, 2013.  (Pl.'s 56.1 ¶ 13.)

    C.    <u>This Litigation</u>

Plaintiffs filed this action on December 5, 2014.  (ECF No. 1.)  On May 27, 2015, defendants moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) or, in the alternative, summary judgment under Rule 56.  (ECF No. 18.)  That motion advanced the argument that all of plaintiffs' claims were barred by the statute of limitations.  (ECF No. 28.)

On July 23, 2015, the Court denied defendants' motion.  (ECF No. 40.)  The Court found that "further development of the factual record [was] necessary" in order to "further elucidate the scope of representation, the last date on which alleged malpractice occurred, whether the fact of loss constitutes an independent act of malpractice, and of course the parties' understanding of the attorney-client relationship."  (<u>Id.</u> at 2.)  Indeed, Mr. Zeltner and Mr. Rohe had not yet been deposed.  Thus, at that stage, judgment for the defendants was unavailable.

Discovery continued for several more months, during which time, among other developments, both Mr. Zeltner and Mr. Rohe were deposed.  (<u>See</u> ECF No. 81, Exhs. E & F.)  On December 3, 2015, defendants moved for summary judgment either in whole or in part, asserting that plaintiffs lacked standing to seek certain avenues of recovery, that no theory of liability would reach damages associated with "non-CTG investments," and renewing the argument that plaintiffs' claims were

7

universally time-barred by the statute of limitations.  (ECF Nos. 71 & 76.)
Plaintiffs opposed and cross moved to amend their complaint to add additional
plaintiffs (ECF No. 80), and briefing became complete on December 29, 2015.  (ECF
No. 89.)

## II.    LEGAL PRINCIPLES

### A.    Standard on Summary Judgment

Summary judgment may not be granted unless a movant shows, based on
admissible evidence in the record, "that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of
a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
On summary judgment, the Court must "construe all evidence in the light most
favorable to the nonmoving party, drawing all inferences and resolving all
ambiguities in its favor."  Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).
The Court's function on summary judgment is to determine whether there exist any
genuine issues of material fact to be tried, not to resolve any factual disputes.  .
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986)

Once the moving party has asserted facts showing that the nonmoving
party's claims cannot be sustained, the opposing party must set out specific facts
showing a genuine issue of material fact for trial.  Price v. Cushman & Wakefield,
Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d
255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture
as to the true nature of the facts to overcome a motion for summary judgment,"

because "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment.  Anderson, 477 U.S. at 248; see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it."  Scott v. Harris, 550 U.S. 372, 380 (2007); see also Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

B.   Malpractice and Breach of Fiduciary Duties Claims

Under New York law, in order to establish a claim of legal malpractice, "a plaintiff must demonstrate that the attorney 'failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal

9

profession' and that the attorney's breach of this duty proximately caused plaintiff to sustain actual and ascertainable damages." <u>Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer</u>, 867 N.E.2d 385, 387 (N.Y. 2007) (quoting <u>McCoy v. Feinman</u>, 785 N.E.2d 714, 718 (N.Y. 2002)).  "To establish causation, a plaintiff must show that he or she … would not have incurred any damages, but for the lawyer's negligence." <u>Id.</u>

"The elements of a cause of action to recover damages for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." <u>Rut v. Young Adult Inst., Inc.</u>, 901 N.Y.S.2d 715, 717 (N.Y. App. Div. 2010).  "A fiduciary relationship 'exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'" <u>EBC I, Inc. v. Goldman, Sachs & Co.</u>, 832 N.E.2d 26, 31 (N.Y. 2005) (quoting <u>Restatement (Second) of Torts</u>, § 874 cmt. a (1979)).

III.   ANALYSIS

As discussed above, plaintiffs initiated this action on December 5, 2014. (ECF No. 1.)  The complaint seeks damages for professional malpractice and breach of fiduciary duty.  (ECF Nos. 1 & 6.)  Under New York law, malpractice actions are subject to a three-year statute of limitations.  <u>N.Y. C.P.L.R.</u> 214(6) (McKinney 2015).  For fiduciary duty claims, "the choice of the applicable limitations period depends on the substantive remedy that the plaintiff seeks." <u>IDT Corp. v. Morgan Stanley Dean Witter & Co.</u>, 907 N.E.2d 268, 272 (N.Y. 2009) (citing <u>Loengard v. Santa Fe Indus.</u>, 514 N.E.2d 113, 115 (N.Y. 1987)).  Where, as here, the remedy is a

claim for money damages, a three-year statute of limitations similarly applies.  Id.
Claims of professional malpractice accrue on "the day an actionable injury occurs,
'even if the aggrieved party is then ignorant of the wrong or injury.'"  McCoy v.
Feinman, 785 N.E.2d 714, 718 (N.Y. 2002) (quoting Ackerman v. Price Waterhouse,
644 N.E.2d 1009, 1011 (N.Y. 1994)).  A cause of action for breach of fiduciary duty
similarly accrues on the day of the breach.  Kaufman v. Cohen, 760 N.Y.S.2d 157,
166 n.3 (N.Y. App. Div. 2003).  Thus, absent an exception to the normal statutes of
limitations, plaintiff can only seek damages related to injuries incurred after
December 5, 2011, that is, within three years of the filing of this action.[4]

Plaintiffs contend that the doctrine of continuous representation applies to
this case.  Defendants dispute the doctrine's applicability, arguing that the limited
nature of the relationship between plaintiffs and defendants after 2009 prevents it
from tolling the statute of limitations.  It is plaintiffs' burden to prove the doctrine's
applicability to the facts of this matter.  Gravel v. Cicola, 747 N.Y.S.2d 33, 34 (N.Y.
App. Div. 2002).

"The two prerequisites for continuous representation tolling are a claim of
misconduct concerning the manner in which professional services were performed,
and the ongoing provision of professional services with respect to the contested
matter or transaction."  Matter of Lawrence, 23 N.E.3d 965, 980 (N.Y. 2014).  "The

---

[4] In addition to cases in which an equitable remedy is sought, a six-year statute of limitations also
applies under CPLR 213(8) "where an allegation of fraud is essential to a breach of fiduciary duty
claim."  IDT Corp. v. Morgan Stanley Dean Witter & Co., 907 N.E.2d 268, 272 (N.Y. 2009).  Neither
the original nor the amended complaint in this action allege the elements of fraud, and "[t]he failure
to disclose a conflict of interest does not transform a breach of fiduciary duty into a fraud."  Access
Point Med., LLC v. Mandell, 963 N.Y.S.2d 44, 47 (N.Y. App. Div. 2013).  Therefore this alternative
route to a six-year statute of limitations is not available to plaintiffs.

rule does not apply to a continuing general relationship between a client and professional." Id. Instead, the continuous representation doctrine only tolls the statute of limitations if there is "a mutual understanding" by both client and professional that made each "acutely aware of [the] need for further representation on the specific subject matter underlying the malpractice claim." Shumsky v. Eisenstein, 750 N.E.2d 67, 72 (N.Y. 2001).

The continuous representation doctrine does not invite a de facto disregard for statutorily imposed time limits in cases alleging attorney malpractice. See McCoy v. Feinman, 785 N.E.2d 714, 722 (N.Y. 2002) ("Except where a date of discovery rule applies, our law cannot permit a limitations period to depend on a continuing omission that can go on for decades."). The Court of Appeals of New York recently explained that the doctrine is informed by narrower rationales: the infeasibility of expecting a layperson "to question and assess the techniques employed or the manner in which [professional] services are rendered," Lawrence, 23 N.E.3d at 980 (alteration in original) (quoting Greene v. Greene, 436 N.E.2d 496, 500 (N.Y. 1982)); the risk that asserting a claim might "'jeopardize his pending case or his relationship with the attorney handling that case during the period that the attorney continues to represent the person' as to the matter giving rise to the malpractice claim," id. at 981 (quoting Glamm v. Allen, 439 N.E.2d 390, 393 (N.Y. 1982)); and the chance that a timely filing "would only 'interrupt corrective efforts.'" Id. (quoting Borgia v. City of New York, 187 N.E.2d 777, 779 (N.Y. 1962)).

Although the first of the rationales the Court of Appeals identified is likely implicated in many, if not most, claims for malpractice, the additional rationales

make clear that the doctrine's principal purpose is to ensure that a wronged client is not forced to choose between asserting her malpractice claim and pursuing the underlying service she sought from a professional.  The Court of Appeals' seminal continuous representation decision, Shumsky v. Eisenstein, 750 N.E.2d 67 (N.Y. 2001), explained that the doctrine is "designed to prevent" a client from being "faced with [a] dilemma," that is, a difficult but conscious choice.  Id. at 71 (quoting Young v. New York City Health & Hosps. Corp., 693 N.E.2d 196, 200 (N.Y. 1998)).

A broad reading of the continuous representation doctrine would effectively impose a "date of discovery" rule for a broad swath of malpractice claims.  This would be inconsistent with settled New York law.  See, e.g., McCoy, 785 N.E.2d at 718 ("What is important is when the malpractice was committed, not when the client discovered it." (quoting Shumsky, 750 N.E.2d at 69)).  It would also conflict with the purpose of the New York legislature, which has amended the relevant statute to clarify its application to all non-medical malpractice claims, however stylized.  See Brothers v. Florence, 739 N.E.2d 733, 737 (N.Y. 2000) (analyzing legislative history behind 1996 amendment to CPLR § 214(6)).

New York courts applying the continuous representation doctrine have emphasized the requirement that both parties intend the attorney to continue providing discrete, identifiable representation on the specific subject matter underlying the malpractice claim.  In Shumsky, the Court of Appeals concluded that the doctrine applied where clients retained an attorney to pursue a claim and he failed to commence the action and then ducked plaintiffs' calls.  750 N.E.2d at 68-69.  The Court emphasized that the parties had executed a retainer agreement that

specifically called on the defendant to "investigate, research and <u>prosecute</u> their claim," and that the parties therefore intended that their specific attorney-client relationship would continue.  <u>Id.</u> at 72 (emphasis in original).

In cases without a retainer agreement that explicitly anticipated further tasks, New York courts have generally found the continuous representation doctrine inapplicable.  In <u>McCoy v. Feinman</u>, 785 N.E.2d 714 (N.Y. 2002), an attorney negligently failed to prepare and submit a qualified domestic relations order (QDRO) in connection with his client's divorce.  <u>Id.</u> at 717.  The same attorney also represented the plaintiff years after the divorce in a Family Court support action, and only formally advised her that he was closing her file shortly before she filed suit.  <u>Id.</u>  The Court of Appeals found that neither the ongoing failure to file a QDRO nor the representation in Family Court tolled the statute of limitations.  <u>Id.</u> at 722.

Similarly, in <u>Williamson ex rel. Lipper Convertibles, L.P. v. PricewaterhouseCoopers LLP</u>, 872 N.E.2d 842 (N.Y. 2007), the Court of Appeals determined that plaintiff's claim against an accounting firm was time-barred because it "entered into annual engagements with defendant for the provision of separate and discrete audit services for the [plaintiff's] year-end financial statements, and once defendant performed the services for a particular year, no further work as to that year was undertaken."  <u>Id.</u> at 847.  Thus, the claims only "establish[ed] defendant's failures within a continuing professional relationship, not a course of representation as to the particular problems (conditions) that gave rise to plaintiff's malpractice claims," and the doctrine was inapplicable.  <u>Id.</u>, <u>see also</u> <u>id.</u>

14

at 846 ("The rule of 'continuous treatment' does not apply to a continuing general relationship between patient and physician or to situations where the patient initiates routine, periodic examinations to check a condition.").

Even where the on-going attorney-client relationship is the subject of an active retainer agreement, the continuous representation doctrine may be found inapplicable.  In <u>Johnson v. Proskauer Rose LLP</u>, 9 N.Y.S.3d 201 (N.Y. App. Div. 2015), plaintiffs "executed a retainer letter" for tax advice with the defendant law firm that referred to the firm's "ongoing representation of plaintiffs."  <u>Id.</u> at 204-05 (alteration omitted).  Notwithstanding the retainer's reference to "ongoing representation," the Appellate Division, First Department determined that plaintiffs could not state a timely claim because "there was no concrete task defendants were likely to perform after they delivered the opinion letter" containing tax advice.  <u>Id.</u> at 208.

Turning to the undisputed evidence in the instant matter, there is no genuine question as to whether the continuous representation doctrine applies here. Edward Rohe testified at his deposition that he never entered into a retainer agreement with Peter Zeltner or his firm, but instead received and paid invoices for specific legal tasks.  (Rohe Dep. 56:7-19, 63:4-15, 70:4-22; 83:12-16, 158:14-19.) Zeltner submitted a sworn affidavit attesting to the fact that the last of his "sporadic[]" legal work specifically for plaintiffs "was the preparation and drafting of wills and revocable trust agreements which was completed on or about September 4, 2008," and that the last legal work he performed in connection with plaintiffs'

family, which related to a trust for their daughter, "was completed no later than August 24, 2009." (ECF No. 78 ¶¶ 4-5.)

Identifying August 24, 2009 as the last possible time that defendants provided legal services to plaintiffs is in accord with the documentary evidence plaintiffs have provided. There was no retainer agreement, at any point, between plaintiffs and defendants. (Rohe Dep. 158:14-19.) The only materials suggesting a relationship after August 24, 2009, are three letters Formanek sent to Edward Rohe and copied to Zeltner, and the copies of the annual accounting statements for Rohe Venture's investment account. (Pl.'s 56.1 ¶¶ 14, 16.) Neither category of document implicates defendants as anything more than passive recipients. Similarly, the lack of details regarding the occasional telephone calls Edward Rohe made to Zeltner after 2009 prevent those calls from being competent evidence of an ongoing legal relationship. (Rohe Dep. 117:3-121:12.) Plaintiffs have not identified any legal tasks or services that were provided or even contemplated in connection with these phone calls. There is simply no evidence of a mutual understanding between plaintiffs and defendants that concrete tasks remained to be performed in connection with the trusts or related entities.

The continuous representation doctrine tolls the time to file an action during the time when a potential plaintiff would otherwise face the dilemma of endangering his underlying claim or losing the time to file his claim for malpractice. There was no such dilemma in this case; as Edward Rohe testified, he called Zeltner to confront him as soon as he learned of the value of the GS and Family Trusts after

Formanek's death.  (Rohe Dep. 227:6-7.)  The hard choice that the doctrine eases simply was not present.

Plaintiffs also argue, as a separate ground for avoiding the time bar of the statute of limitations, that the doctrine of equitable estoppel applies to this case. Equitable estoppel operates to exempt an action from a statute of limitations defense "where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action."  Simcuski v. Saeli, 377 N.E.2d 713, 716 (N.Y. 1978).  It is "fundamental to the application of equitable estoppel for plaintiffs to establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit."  Zumpano v. Quinn, 849 N.E.2d 926, 929 (N.Y. 2006). Under New York law, the doctrine "is an 'extraordinary remedy,'" Twersky v. Yeshiva Univ., 993 F. Supp. 2d 429, 442 (S.D.N.Y. 2014) (quoting Pulver v. Dougherty, 871 N.Y.S.2d 495, 496 (N.Y. App. Div. 2009)), which "should be 'invoked sparingly and only under exceptional circumstances.'"  Id. (quoting Abercrombie v. Andrew Coll., 438 F. Supp. 2d 243, 265 (S.D.N.Y. 2006)).

Plaintiffs' invocation of the equitable estoppel doctrine is legally insufficient. "For the doctrine to apply, a plaintiff may not rely on the same act that forms the basis for the claim—the later fraudulent misrepresentation must be for the purpose of concealing the former tort."  Ross v. Louise Wise Servs., Inc., 868 N.E.2d 189, 198 (N.Y. 2007).  Were this not the rule, the doctrine would in effect eliminate the statute of limitations in cases in which an attorney was alleged to fail to disclose his malpractice or to commit malpractice by some other act of nondisclosure.  See Mohamed v. Donald J. Nolan, Ltd., 967 F. Supp. 2d 647, 656 (E.D.N.Y. 2013).

17

Because the acts plaintiffs allege constitute malpractice or breach of fiduciary duty are the same that underlie their invocation of equitable estoppel, the doctrine cannot operate to bar the statute of limitations in this action.

Based on the foregoing, it is apparent that a three-year statute of limitations period applies to this action.  The same lack of evidence of any ongoing legal relationship between plaintiffs and defendants after August 2009 demonstrates that Zeltner and Bertine Hufnagel neither provided plaintiffs with legal services nor carried on a fiduciary relationship with plaintiffs within three years of the December 5, 2014 filing of this action.  Therefore any claim for legal malpractice or breach of fiduciary duty occurred outside of the three-year window applicable to this action and is time-barred by the statute of limitations.

IV.    CONCLUSION

For the reasons stated in this Opinion & Order, defendants' motion for summary judgment is GRANTED.  The Clerk of Court is directed to terminate the motion at Docket No. 71 and to terminate this action.


SO ORDERED.

Dated:    New York, New York
          February 1, 2016

_____
          KATHERINE B. FORREST
          United States District Judge